CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

5/31/18

JULIA C. DUDLEY, CLERK
BY:    s/ K. DOTSON
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| TROY B., | ) | |
| Plaintiff, | ) | Civil Action No. 5:17-cv-00007 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY A. BERRYHILL, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Troy B. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying his application for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral

arguments, and the applicable law, I cannot conclude that substantial evidence supports the

Commissioner's final decision. Therefore, I recommend that the Court deny the Commissioner's

Motion for Summary Judgment, ECF No. 13, reverse the Commissioner's final decision, and

remand the case for further administrative proceedings under the fourth sentence of 42 U.S.C. §

405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

Troy B. applied for DIB and SSI on February 20, 2013, alleging disability caused by a

hip fracture, broken pelvis, stomach repair, high blood pressure, and torn ligaments and tendons

in his right thumb. Administrative Record ("R.") 48, 58, ECF No. 9-1. He alleged onset of

disability as September 11, 2012, at which time he was forty-two years old. *Id.* Disability

Determination Services ("DDS"), the state agency, denied his claims at the initial, R. 48–67, and

reconsideration stages, R. 70–93. On September 24, 2015, Troy B. appeared with counsel and

testified about his impairments at an administrative hearing before ALJ William Barto. R. 23–40.

The ALJ also heard testimony from a vocational expert ("VE") regarding Troy B.'s work history

and the availability of other jobs in the national and local economies. R. 40–47.

ALJ Barto denied Troy B.'s claims in a written decision issued on November 6, 2015. R.

99–111. He found that Troy B. had severe impairments of "hip/pelvic bone fracture and

degenerative disc disease," R. 101, but all other alleged impairments—including essential

hypertension, hyperlipidemia, hernias, and anxiety—were non-severe, R. 101–02. The ALJ next

determined that Troy B.'s impairments, either alone or in combination, did not meet or medically

equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 103.

As to Troy B.'s residual functional capacity ("RFC"),[1] the ALJ found that he could

perform light work[2] except that he "must alternate to sitting for 10 minutes after 1 hour of

standing, alternate to sitting for 10 minutes after 45 minutes of walking," and could only

"occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch,

and crawl." R. 103; *see also* R. 103–09. Based on this RFC and the VE's testimony, the ALJ

found that Troy B. could not perform his past relevant work as a saw operator, but he could

perform certain "light" jobs existing in significant numbers in the national economy including

mail room clerk, order filler, and inside sales attendant. R. 109–11. The ALJ thus determined that

Troy B. was not disabled. R. 111. The Appeals Council denied Troy B.'s request for review, R.

1–3, and this appeal followed.

III. Facts

*A.    Relevant Medical Evidence*

*1.    September 2012 Accident*

Troy B.'s medical impairments stem from an accident in September 2012 when, while

loading the trailer of a truck, the trailer rolled forward, and struck him on the left side of his

body. R. 29; *see also* R. 395 ("[He] was loading part of a semi-truck onto a trailer . . . when the

trailer came loose and pinned him between his truck and the trailer."). He remained pinned

between the trailer and truck for fifteen to twenty minutes, after which was airlifted to the trauma

room at Roanoke Memorial Hospital. R. 29; *see also* R. 295–314. Imaging revealed

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

"comminuted fracture at the junction of the left superior pubic ramus to the acetabulum with some involvement of the anterior acetabular pillar," "fracture of the left pubic bone with some diastases of the symphysis pubis," "nondisplaced fracture of the left inferior pubic ramus," and "nondisplaced fractures of both sacral ala." R. 302. Troy B. was discharged from the hospital four days later with diagnoses of "fracture of the sacrum," "pubic ramus fracture," and "fracture of the left acetabulum." R. 315. He was advised to use a rolling walker to assist with ambulation and to follow up in two weeks. R. 316. Troy B. returned to the trauma clinic five days later with multiple blood clots. *See* R. 486–546. Troy B. also followed up on October 15, and again on November 8. R. 323–29. On November 8, Troy B. reported he had been doing well and was slowly starting to walk on the left lower extremity. R. 328. In his left hip, he had "near full" range of motion compared to the right, no significant pain with motion, 5/5 strength, and no pain with pelvic compression. *Id.* He was instructed to progress from 50% weight bearing to full weight bearing over the next month. *Id.* Imaging of the pelvis showed "ongoing healing of fractures without change in alignment" in both October and November. R. 331–32.

2.    *Dr. Forbes*

Troy B. treated frequently with John Forbes, M.D., his primary care provider. Troy B. visited Dr. Forbes four times in 2013. On February 4, Troy B. reported a "lot of pain over the pelvis," particularly on the left side, which went down into the groin and hurt when he walked "far at all." R. 366. Troy B. also noted a "knot" on the left side that was not present on the right. *Id.* Dr. Forbes observed tenderness over the pelvic area and the trochanteric area on the left and pain with straight leg raising and internal and external rotation of the left hip. R. 367. He noted "a rather prominent hard mass . . . around the superior ramus of the pelvic area on the left," and he ordered X-rays to further identify the hard mass and prescribed Percocet. *Id.* On May 13, Troy

B. followed up for medication renewals and chiefly complained of pain in his low back, left hip, and, most significantly, in his left pelvic area down into the groin. R. 363. Troy B. noted that he was "functioning as long as he [took] the oxycodone for pain." *Id.* Physical examination revealed "a knot over left lower ramus of pelvis and hip and tender over right tuber ischi." R. 364. Dr. Forbes noted that Troy B. was "extremely tender over the . . . left inferior ramus of the pelvis," and that he also experienced "some pain" on the right side of the pelvis as well as over the trochanter area of the left hip. *Id.* Dr. Forbes continued him on oxycodone and diclofenac. *Id.* On June 27, Troy B. reported that he felt "pretty good" despite still having some back pain and exhibiting musculoskeletal tenderness on examination. R. 451–52. On November 27, Troy B. complained of worsening pain in his left hip and low back which radiated down his left leg to the calf, and he requested a referral to an orthopedist at the University of Virginia ("UVA"). R. 456. Dr. Forbes observed that Troy B. appeared to be in pain when he got up to walk. R. 458 ("[H]e limps from his chair over to the examining table and it takes a while once he stands up to start moving off."). Dr. Forbes noted tenderness over the left hip area and left sacroiliac ("SI") and buttocks area of the back. *Id.* He also observed significant tenderness on the lateral side of the symphysis pubic bone, about halfway between the hip and symphysis pubis; pain on both sides with straight leg raising test at about sixty to sixty-five degrees; and pain with flexion, internal rotation, and external rotation of the left hip, but not the right. *Id.* Dr. Forbes opined that Troy B. could potentially benefit from injections or physical therapy, but noted that Troy B. had not followed through on past recommendations for this treatment because he could not afford it. *Id.*

Troy B. treated with Dr. Forbes twice in 2014. On March 26, Troy B. reported "a lot of pain in his pelvic area" from the waist to the upper thighs, and he again asked for the "hard area sticking up on the left side of the pelvis" to be evaluated. R. 412. On examination, Troy B.

walked "with a limp and ha[d] difficulty stepping up on the examining table." R. 414. Dr. Forbes observed tenderness "over the left pelvic area down in the area where the adductor muscles look on to the pelvis and also over the pelvic rim." *Id.* Dr. Forbes stated that X-rays of this area had not revealed anything, but that an MRI might be needed. *Id.*; *see also* R. 423 (order for MRI). On July 23, Troy B. stated that since his injury, he had experienced a lot of low-back pain, which radiated into his legs, and pelvic-area pain over the left iliac crest. R. 481. On examination, straight leg raising test was positive bilaterally at thirty to thirty-five degrees. R. 484. Deep tendon reflexes were "good at the knees and Achilles areas, symmetrical and active." *Id.* Dr. Forbes also observed tenderness across Troy B.'s lower back. *Id.*

Troy B. treated with Dr. Forbes twice in 2015. On February 3, Troy B. reported primarily experiencing chronic, persistent pelvic pain and explained that he could "walk around but if he ha[d] to do any lift and twist or turning or bending, it [gave] him quite a bit of trouble." R. 547. Troy B. explained that "the only way he is able to function at all is because . . . [the of oxycodone that he [took] every 4 hours," but he did not think Flexeril or diclofenac helped much. *Id.* On examination, straight leg raising test was positive bilaterally at about seventy degrees. *Id.* Dr. Forbes observed that internal and external rotation of the hips appeared to cause pain, *id.*, and that Troy B. had "tenderness over the pelvic area particular[ly] [the] anterior pelvis when [he] push[ed] down over the symphysis pubis," as well as over the iliac crest, R. 550. Dr. Forbes continued Troy B. on oxycodone, but did not renew his prescriptions for Flexeril or diclofenac. *Id.* On May 21, Troy B. complained of worsening pain in his left hip, left pelvic area, and back, and he reported difficulty ambulating and doing many activities. R. 550–51. On physical examination, Troy B. exhibited tenderness over the SI area through the paraspinous muscles of the lumbar spine on the left; tenderness over the left trochanter and pain with lateral and external

rotation of the left hip; limited ability to reflex left hip; tenderness over the left pelvic area; and

pain in the right groin on rotation and with raising of the right leg. R. 552–53. Dr. Forbes

assessed back pain and multiple closed fractures of the pelvis with stable disruption of the pelvic

circle. R. 554.

     *3.*    *Consultative Examination*

On October 26, 2013, Troy B. presented to Scott Kohler, M.D., for a consultative

examination as part of his applications for benefits. R. 377–83. He reported a history of hip and

pelvis fracture, which presently caused pain, a limping gait, and difficulty with walking, bending,

lifting, and prolonged sitting and standing. R. 377. Troy B. estimated that he could sit for fifteen

to twenty minutes, stand for fifteen to twenty minutes, walk short distances, and lift and carry ten

pounds frequently and fifteen to twenty pounds occasionally. R. 379. Troy B. stated that weight-

bearing activities exacerbated his pain and rest and medication "offer[ed] some relief." R. 377.

On physical examination, Dr. Kohler observed a "steady, but asymmetric, slow, antalgic,

and limping gait. The claimant did not come with an assistive device." R. 380. Troy B. generally

had 5/5 strength throughout his bilateral upper and lower extremities, except that strength was

4+/5 for hip flexion, abduction, and adduction on the left. *Id.* Straight leg raising test was

negative bilaterally, and reflexes were normal. R. 380–81. On musculoskeletal examination, Dr.

Kohler noted

> no joint swelling, erythema, effusion or deformity. There was tenderness to
> palpation over the left hip and greater trochanter. The claimant was able to lift,
> carry and handle light objects. The claimant was unable to squat and rise from
> that position. The claimant was able to rise from a sitting position without
> assistance but had some difficulty getting up and down from the exam table. The
> claimant was able to walk on heels but was unable to walk on toes. Tandem
> walking was abnormal and the claimant could hop on the right foot, and could
> stand but not hop on the left. The claimant can dress and undress adequately well,
> and was cooperative and gave good effort during the examination.

R. 381. Range of motion was normal, except for internal and external rotation of the left hip. *Id.*

Regarding Troy B.'s functional limitations, Dr. Kohler opined that because of his hip pain, Troy B. could "be expected to sit 2 hours at a time before needing a break and at least 6-8 hours total," "stand 1 hour at a time before needing a break, and at least 4-6 hours total," and "walk 45 minutes at a time before needing a break, and at least 2-3 hours total," during a workday. R. 382. He did not need an assistive device for walking short or long distances or on uneven terrain. *See id.* His hip pain also limited him to occasional "bending, stooping, crouching, squatting, and so on." *Id.* Dr. Kohler did not impose any further limitations, but did mention that Troy B. could "benefit from improved pain control." R. 382–83.

4. *UVA Specialists*

Troy B. also received treatment at UVA from several different providers, who examined him and reviewed imaging. In December 2013, an X-ray of his lumbar spine revealed "minimal degenerative disc disease at L5-S1. No acute fracture or listhesis of the lumbar spine. Incomplete evaluation of irregularity along the iliopectineal line and left superior pubic ramus. Findings may be posttraumatic." R. 431. An MRI of the lumbar spine taken around the same time showed "mild broad base disc bulge at L4-5 and L5-S1. No significant spinal canal or neural foraminal stenosis within the lumbar spine." R. 428.

On January 22, 2014, Troy B. treated with Francis Shen, M.D., an orthopedist. R. 398–99. Dr. Shen noted that Troy B.'s main complaint was his left groin pain, but he did have radiating pain in his back too. R. 398. On physical examination, Troy B. ambulated without aids, had good strength in his lower extremities, and had intact sensation. *Id.* Dr. Shen observed that an "exam of his left groin shows that he does have prominent what appears to be perhaps a pubic

symphysis and it is . . . tender to direct palpation,"[3] but range of motion of the hip and knee was otherwise painless. *Id.* Dr. Shen explained that Troy B.'s back pain was coming from "degenerative disease and mainstay treatment for this continues to be anti-inflammatories, physical therapy modalities, and surgical intervention for the management of degenerative disease is inconsistent." R. 399. Dr. Shen determined that Troy B.'s left leg pain stemmed "from some nerve root irritation," and that his pubic symphyseal displacement was a "nonoperative problem at this point." *Id.* Dr. Shen referred Troy B. to the trauma team because his pelvic-area pain caused a fair amount of discomfort. *Id.* An X-ray of the pelvis taken the same day revealed healed fractures, "unchanged, mild, widening at the public symphysis," maintained SI joints, and mild degenerative changes at the hips bilaterally. R. 403.

On February 25, Troy B. had an appointment with the trauma team and treated with Seth Yarboro, M.D., for his bilateral hip pain. R. 394–98. A physical examination revealed tenderness in the anterior left groin, tenderness to palpation along the inguinal canal, and a "mass of [heterotopic ossification] from superior ramus." R. 396; *see* R. 406. Troy B. exhibited diminished range of motion in his hips and discomfort during testing, left greater than right. R. 396–97. He had 4/5 strength for abduction and for flexion, but 5/5 strength for adduction. R. 397. Gait was normal, and Faber Test, Ober's Test, and straight leg raising test were negative. *Id.* Dr. Yarboro assessed history of "stable pelvic ring injury (Lateral compression type) in September 2012, heterotopic ossification[4] pubic symphysis and rami, and left groin pain . . . and irritation along inguinal canal." *Id.*; *see* R. 406. Dr. Yarboro noted that he did "not suspect hip as source

---

[3] The pubic symphysis is "the joint formed by union of the bodies of the pubic bones in the median plane by a thick mass of fibrocartilage." *Dorland's Illustrated Medical Dictionary* 1842 (31st ed. 2007).

[4] Heterotopic ossification is "the formation of bone in abnormal locations, secondary to pathology either at the local site or elsewhere" in the body. *Dorland's Illustrated Medical Dictionary* 1364–65 (31st ed. 2007).

for pain," and he noted that a referral to a urology specialist for an assessment of the groin pain may be appropriate. R. 397.

Acting on this referral, Troy B. treated with urologist Matthew Timberlake, M.D., on March 11, 2014. R. 392–94. Dr. Timberlake noted "significant pubic symphysis pain over a bony protuberance," and tenderness in this region during examination. R. 393–94. Dr. Timberlake assessed "[c]hronic bony pubic pain/deformity after pelvic fracture," but noted that Troy B.'s pain was "not urologic in origin." R. 394.

Troy B. returned to Dr. Shen on October 31, complaining of worsening back pain. R. 484–85. Dr. Shen observed pain in the hip with internal rotation bilaterally on physical examination. R. 484. Dr. Shen reiterated to Troy B. that his back pain came from degenerative disc disease, and he provided a prescription for therapy. R. 485.

5.    *DDS Opinion Evidence*

On November 7, 2013, Tony Constant, M.D., assessed Troy B.'s physical functioning as part of the initial review of his benefits applications. R. 49–55, 59–65. Dr. Constant concluded that Troy B. could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently and could sit for about six hours and stand and/or walk about six hours during an eight-hour workday. R. 53–54, 64. Dr. Constant also found that Troy B. could frequently balance and occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. R. 54, 64. Dr. Constant did not impose any further limitations. Gurcharan Singh, M.D., reassessed Troy B.'s physical functioning on May 2, 2014, as part of the reconsideration review. R. 71–78, 83–90. Dr. Singh found that Troy B. could lift and/or carry twenty-five pounds occasionally and twenty pounds frequently, but he affirmed Dr. Constant's findings in all other respects. R. 77–78, 89–90.

B.      *Troy B.'s Report of Symptoms and Testimony*

In July 2013, Troy B. submitted an Adult Function Report as part of his applications. R. 229–39; *see* R. 50, 114. Troy B. indicated that he lived in a house by himself and that he "stay[ed] in bed most of the day because of the pain and anxiety." R. 229. His pain affected his sleep and personal care. R. 233. For example, he could dress slowly and found it "extremely hard" to get in and out of the tub. *Id.* He prepared microwave meals daily and stated that he used to enjoy cooking before his injuries. R. 234. He vacuumed twice a month and washed dishes as he used them, which took him three times as long as before his accident. R. 234–35. His dad, who lived next door, helped with the laundry, mowing the grass, and anything else that needed to be done. *Id*. He went outside once or twice a day, and he shopped for food for about an hour twice a month. R. 235. Troy B. used to fish, hunt, and play softball and basketball, but his only remaining interests were reading and watching television. R. 236. He spoke with friends on the phone, but did not go out to socialize because of his anxiety. R. 236–37. Troy B. indicated difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering things, completing tasks, concentrating, and getting along with others. R. 237. He could walk approximately fifteen feet before needing to stop and rest for five minutes. *Id.*

At the administrative hearing, Troy B. testified that he lived in a house owned by his dad, who lived next door and did not charge him rent. R. 23–24. Troy B. described the accident with the tractor-trailer from September 2012 and explained how the trailer hit him on the leg and over the stomach and pinned him against the tailgate of his truck until bystanders pulled it off him fifteen to twenty minutes later. R. 29. He could not stand up and walk for the next two and a half months. R. 30. Before this incident, he used to walk a mile a day, but now he was confined to

12

walking within a two-block radius of his house. R. 31. He could not sit in one place for very

long, and he could stand for at most ten to fifteen minutes before having to lie down because of

the pain. *Id.* On a typical day, Troy B. would wake up, eat breakfast, and lie back down, where

he would either watch television or just stay in bed in silence. R. 36–37.

IV. Discussion

Troy B. generally argues that substantial evidence does not support ALJ Barto's decision

and that his case should be remanded. Pl.'s Br. 2, ECF No. 12. He primarily takes issue with ALJ

Barto's credibility assessment and contends that his "statements as to the intensity, persistence,

and functionally limiting effects of pain are substantiated . . . [by] the record." *Id.* at 4. I agree

that ALJ Barto's discussion of Troy B.'s symptoms contains flaws, and I cannot find that

substantial evidence supports his decision. Therefore, reversal and remand is required.

A.    *Severity of Symptoms: Legal Standard*

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms.

*Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 96-7p, 1996 WL

374186, at *1 (July 2, 1996), *superseded on other grounds by* SSR 16-3p, 2016 WL 1119029

(Mar. 2, 2016). "First, the ALJ looks for objective medical evidence showing a condition that

could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76

F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the

intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to

which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and

continuing basis, *see Mascio v. Colvin*, 780 F.3d 632, 636–37, 639 (4th Cir. 2015). "The second

determination requires the ALJ to assess the credibility of the claimant's statements about [his]

symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this two-step

inquiry, the ALJ must consider "all the available evidence in the record" bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment or related treatment. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). Ultimately, the ALJ's articulated reasons for discounting a claimant's subjective complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

Here, ALJ Barto found that Troy B.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms" that he described at the administrative hearing and in written submissions to the agency, but that Troy B.'s "statements describing the intensity, persistence, and limiting effects of these symptoms [were] not fully persuasive for the reasons explained in [the ALJ's] decision." R. 107; *see* R. 104. None of ALJ Barto's reasons withstand scrutiny.

B.     *Lack of Objective Evidence*

First, ALJ Barto stated that "[a]s a threshold matter, [the] claimant's allegations are not entirely supported by objective evidence of record" because although Troy B. "reported constant pain in his left buttocks, lower left back, left hip and leg, and groin," only "[t]he location of his pain and other symptoms [was] consistent with his injury, but [his reports of pain were] unexplained in terms of its ongoing nature." R. 107. ALJ Barto does not cite any evidence to support this overarching conclusion. This reasoning is problematic because in summarizing the

medical evidence, ALJ Barto neglected to discuss significant portions of objective evidence contained in the treatment notes from each provider that could support Troy B.'s claims of pain. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Here, ALJ Barto's omissions run contrary to his duty to consider the entire record.

As described above, Dr. Forbes frequently observed positive straight leg raising tests bilaterally, significant pain and tenderness to palpation during hip and groin examinations, abnormal gait, and limited range of motion in the hip joint. *See supra* Pt. III.A.2. Most of these observations do not appear in ALJ Barto's discussion of the record, *see* R. 103–07, but they demonstrate manifestations of Troy B.'s pain. The ALJ's general failure to consider all the relevant evidence inhibits the Court's ability to conduct meaningful review. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.").

The ALJ did not consider whether the heterotopic ossification of the pubic symphysis and rami could be the cause of Troy B.'s ongoing pain. Dr. Forbes, Dr. Shen, Dr. Yarboro, and Dr. Timberlake all observed an abnormal bony mass in the region where Troy B. most frequently complained of pain, specifically, his left pelvic area along the pubic symphysis. R. 367 (Dr. Forbes), 394 (Dr. Timberlake), 396–97 (Dr. Yarboro), 398 (Dr. Shen). Dr. Yarboro, to whom Dr. Shen referred Troy B. for an evaluation of his pain in this region, diagnosed the "bony mass" as heterotopic ossification pubic symphysis and rami. R. 397; *see* R. 406. Although ALJ Barto acknowledged Dr. Yarboro's diagnosis, R. 106, he did not discuss it further. As Troy B. notes, Pl.'s Br. 4, heterotopic ossification is characterized by bone growing in an abnormal location and

can result from trauma, *see* Dia Shehab, Abdelhamid H. Elgazzar, & B. David Collier,

*Heterotopic Ossification*, 43 J. Nuclear Medicine 346, 346 (Mar. 2002) ("Heterotopic

ossification (HO) . . . is the presence of bone in soft tissue where bone normally does not exist. . .

. [T]he most common is the acquired form. In the acquired form, HO usually either is

precipitated by trauma (such as fracture, total hip arthroplasty . . . , or direct muscular trauma) or

has a neurogenic cause (such as spinal cord injury or central nervous system injury)."),

http://jnm.snmjourals.org/content/43/3/346.full.pdf+html. Here, the abnormal bone growth

occurred in the left pelvic area, where Troy B. suffered trauma during the September 2012

accident. By its very definition, then, and given that it developed in the area where Troy B. most

frequently complained of pain, heterotopic ossification could be an independent source of Troy

B.'s ongoing pain, as noted by Dr. Forbes, R. 364, 367, 412, Dr. Timberlake, R. 394, Dr. Shen,

R. 399, and Dr. Yarboro, R. 397. The ALJ, however, did not discuss why this condition did or

did not cause the reported symptoms. In light of the medical evidence focusing on this condition,

the absence of any explanation by the ALJ undermines his finding that the objective evidence of

record does not explain the ongoing nature of Troy B.'s pain. *See Radford*, 734 F.3d at 296

("Given the depth and ambivalence of the medical record, the ALJ's failure to adequately

explain his reasoning precludes this Court and the district court from undertaking a 'meaningful

review' . . . .").

C.    *Limited Abnormalities and Routine Treatment*

Next, ALJ Barto reasoned that "[r]ecords show routine treatment with limited

abnormalities on clinical examination and diagnostic study," for which he provides many

examples. These examples, however, are not borne out by the record or do not clearly undermine

Troy B.'s complaints of pain. ALJ Barto first noted that Troy B. reported improvement of his

back pain with medication. R. 107 (citing 483–84). The ALJ is correct that during a visit to Dr. Forbes on July 23, 2014, Troy B. reported that Flexeril gave "him some relief of [back] pain," R. 484, but this is the only instance in the record of Troy B. expressly acknowledging relief for his back pain. Indeed, Troy B. later told Dr. Forbes that he did not think the Flexeril helped, and Dr. Forbes did not renew the prescription. R. 550. The ALJ did not explain why this one instance outweighs numerous other occasions where Troy B. reported back pain despite taking medication, *see* R. 363 (May 13, 2013), 451 (June 27, 2013), 456 (Nov. 27, 2013), 398 (Jan. 22, 2014), 414 (Mar. 26, 2014), 484 (Oct. 31, 2014), and his reliance on it constitutes improper "cherrypicking" of evidence by the ALJ, *see Lewis*, 858 F.3d at 869.

ALJ Barto also cited Dr. Kohler's consultative examination and noted that although Troy B. displayed "tenderness to palpation over the left hip, decreased range of motion with left hip rotation, and mild weakness in the left hip," he "needed no assistive device for ambulation." R. 107–08 (citing R. 382). That Dr. Kohler concluded Troy B. did not need an assistive device for ambulation despite the referenced objective findings could address the degree of limitation caused by these symptoms, but Dr. Kohler's assessment does not compel the conclusion that Troy B.'s statements about his pain and his functional abilities were not entirely credible. The record contains both Dr. Forbes's, R. 414, 458, and Dr. Kohler's, R. 380, observations of Troy B. ambulating with an abnormal, slow, limping, and painful gait. *See also* R. 31, 224–25, 237, 363, 366, 551 (other providers noting gait was generally abnormal, slow, and painful). These observations support, rather than contradict, Troy B.'s description of his pain and symptoms and their resulting effect on his ability to walk. Thus, the ALJ's notation that Troy B. could walk without an assistive device, despite his general tenderness, weakness, and limited range of motion of his left hip, does not support his adverse credibility determination.

ALJ Barto next noted that "although the claimant asserted in March 2015 that he needed oxycodone to function, his doctor discontinued the claimant's Flexeril and diclofenac, because the claimant felt that they were unnecessary." R. 108. The ALJ followed this by stating "[w]hen the claimant returned to see his doctor for follow up in May 2015, he reported that his pain was worse." *Id.* These observations—that Troy B. needed strong pain medication to function, stopped taking anti-inflammatories because they were ineffective, and experienced increased pain—do not undermine Troy B.'s credibility about the intensity, persistence, and limiting effects of his impairments. Rather, they suggest the opposite conclusion.

ALJ Barto also referenced the November 2012 X-ray showing healing pelvic fractures, the December 2013 MRI of the lumbar spine, and the January 2014 MRI of the hips as evidence that imaging showed no more than limited abnormalities. R. 107–08 (citing R. 332, 424, 428). The ALJ accurately characterized the results of these imaging studies, and he may appropriately rely on them as evidence that is inconsistent with Troy B.'s report of symptoms. *See Bishop*, 583 F. App'x at 68 (finding no error when "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility"); *see also Craig*, 76 F.3d at 595 (noting that "a claimant's allegations about [his limitations] . . . need not be accepted to the extent they are inconsistent with the available evidence").[5] The problem is that this imaging does not account for the diagnosed heterotopic ossification, which, again, is a bone growth in the joint near Troy B.'s pubic symphysis, placing it in the exact area where Troy B. consistently reported the most debilitating pain. The imaging of his back, pelvis, and hips does not obviously address this abnormal bone growth as a possible independent source of Troy B.'s pain, but ALJ Barto did not discuss heterotopic ossification beyond identifying Dr. Yarboro's diagnosis. Dr. Yarboro identified and diagnosed this condition, and Dr. Timberlake linked Troy B.'s pain to a pubic

---

[5] Dr. Shen and Dr. Forbes both attributed some of Troy B.'s pain to his back impairment.

bony protuberance, rather than a urologic source. Dr. Forbes also identified the symphysis pubis as a source of Troy B.'s most significant pain. Thus, the ALJ's discussion of the imaging does not provide a reason to dismiss Troy B.'s claim of disabling pubic and groin pain.

D.    *Activities of Daily Living*

ALJ Barto also referenced Troy B.'s activities of daily living in finding him not entirely credible. An ALJ may consider a plaintiff's activities of daily living in assessing the credibility of the plaintiff. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). Here, ALJ Barto stated, in full, that Troy B.

> indicated that he was slow in performing activities of daily living, but that he was not really limited. He said he could slowly manage his personal care needs. He said that his sleep was troubled by dreams of the accident that crushed his hip and he had difficulty getting in and out of the tub. He prepared simple meals and indicated that he used to enjoy cooking. He said that he slowly ran the vacuum and did dishes, and that his father helped him with laundry and did yard work. He said he had panic attacks about driving, but that he went outside daily and shopped for food. He said that he managed his money independently, watched television, and spoke with friends on the phone. Thus, it does not appear that the claimant's activities of daily living were limited to the extent one would expect given the complaints of totally debilitating symptoms.

R. 108. ALJ Barto does not, however, adequately explain how these examples undermine Troy B.'s complaints of pain, and therefore I cannot find that substantial evidence supports this line of reasoning.

This discussion suffers from many of the same flaws as the rest of the ALJ's decision. For one, Troy B. never stated that "he was not really limited," R. 108, and the ALJ does not provide any citation in support of that characterization. Indeed, his testimony, function report, and treatment notes documenting his subjective complaints reveal Troy B.'s consistent descriptions of having significant functional limitation. *See supra* Pts. III.A, C. ALJ Barto also presented only portions of Troy B.'s statements when citing certain examples. Of note, Troy B.

stated that he "can't sleep because I keep hav[ing] dreams about [the] accident. *Also, due to the pain, keeps me awake*." R. 233 (emphasis added); *see also* R. 37 (testifying that he experiences hip and low back pain while he sleeps, which also interrupts his sleep). The ALJ's characterization of Troy B.'s sleep difficulties as being caused only by bad dreams does not tell the full story and is yet another example of him impermissibly "cherrypicking" evidence to Troy B.'s detriment. *See Lewis*, 858 F.3d at 869.

As for the remainder of the examples, the ALJ left out relevant qualifying language and did not explain how such activities translate into an ability to perform substantial gainful activity. This is error. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them."). That Troy B. slowly managed his personal care needs, shopped for food on an infrequent basis, and performed limited household chores for which he required his dad's assistance does not suggest that he could "persist through an eight-hour workday." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017). Indeed, "a claimant's ability to perform modest activities of daily living is not a reason to reject claims that impairments cause disabling limitations." *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *15 (W.D. Va. Sept. 12, 2014) (collecting cases). Therefore, without more explanation from the ALJ, none of these examples constitutes substantial evidence to support discounting Troy B.'s report of symptoms based on his daily activities.

E.    *Incorporating Troy B.'s Statements in the RFC*

Last, ALJ Barto references Troy B.'s statements to Dr. Kohler that "he could sit for 15-20 minutes, stand for 15-20 minutes, walk short distances, lift and carry 10 pounds frequently and 15-20 pounds occasionally due to hip problems," and noted that he "included similar limitations

in the residual functional capacity herein." R. 108. As Troy B. points out, the ALJ's statement is inaccurate, and the RFC reflects the limitations identified by Dr. Kohler, not the limitations expressed by Troy B. to Dr. Kohler. Pl.'s Br. 7. Dr. Kohler concluded that Troy B. could stand one hour at a time and walk for forty-five minutes at a time before needing a break, R. 382, and these exact limitations appear in the RFC, R. 103. Dr. Kohler further concluded that Troy B. could sit for two hours at a time, and the ALJ did not include any limitation on Troy B.'s sitting beyond the general limitation to light work. R. 103. The ALJ did not provide any explanation for how these findings are similar to Troy B.'s statements that he could sit for no more than twenty minutes, stand for no more than twenty minutes, and walk no more than short distances. Without an explanation, I cannot conclude that the RFC includes "similar limitations" to those expressed by Troy B. to Dr. Kohler.

On remand, the Commissioner must consider all of the evidence relevant to Troy B.'s complaints of pain and explain how the evidence effects his functional abilities.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 13, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such

21

proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations
within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is
directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States
District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of
record.

ENTER: May 31, 2018

Joel C. Hoppe
United States Magistrate Judge